**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

-------------------------------------------------------------------------×

DAVID CORSARO,

        *Plaintiff,*

        *v.*                                          **21-CV-1748**

COLUMBIA HOSPITAL AT MEDICAL CITY     **COMPLAINT**
DALLAS SUBSIDIARY, L.P. d/b/a MEDICAL
CITY DALLAS HOSPITAL, HCA HOLDINGS,     *Jury Trial Requested*
INC., PRUDENTIAL INSURANCE COMPANY
OF AMERICA, and SEDGWICK CLAIMS
MANAGEMENT SERVICES, INC.,

        *Defendants.*

-------------------------------------------------------------------------×

      Plaintiff David Corsaro, by his counsel, The Harman Firm, LLP, alleges for his Complaint against Defendants Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas Hospital ("MCD"), HCA Holdings, Inc. ("HCA"), Prudential Insurance Company of America ("Prudential"), and Sedgwick Claims Management Services, Inc. ("Sedgwick"), (collectively "Defendants"), as follows:

**PRELIMINARY STATEMENT**

      1.     Plaintiff Corsaro seeks damages and costs against Defendants MCD and HCA for terminating his employment in retaliation for requesting and taking leave under the Family and Medical Leave Act ("FMLA") in violation of the FMLA, 29 U.S.C. §§ 2601 *et seq*.

      2.     Plaintiff seeks damages and costs against Defendants MCD and HCA for failing to provide him with reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*.

3. Plaintiff seeks damages and costs against Defendants MCD and HCA for terminating his employment based on disability in violation of the ADA. 42 U.S.C. §§ 12112 *et seq*.

4. Plaintiff seeks damages and costs against Defendants MCD and HCA for failing to provide him with reasonable accommodation in violation of the Texas Labor Code Sec. 21.128.

5. Plaintiff seeks damages and costs against Defendants MCD and HCA for terminating his employment based on disability in violation of the Texas Labor Code Sec. 21.051.

6. Plaintiff seeks equitable relief against Defendants Sedgwick and Prudential for breaching their fiduciary duty by wrongfully denying Plaintiff benefits to which he is entitled, namely, short-term disability benefits in violation of Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*.

7. Plaintiff seeks damages against Defendants Sedgwick and Prudential for failing to make long-term disability benefits available to Plaintiff after they illegally limited his short-term disability benefits under ERISA. 29 U.S.C. §§ 1001 *et seq*.

**JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES**

8. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under the FMLA, ADA, and ERISA.

9. Pursuant to 28 U.S.C. § 1367 this court has supplemental jurisdiction over the Texas Labor Code claims.

10. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Northern District of Texas, as a substantial part of the events giving rise to these claims occurred within this District.

11. All conditions precedent to maintaining this action have been fulfilled.

12. With respect to the ADA claims, a charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a Right-to-Sue letter dated April 29, 2021 relating to the discriminatory acts described in this Complaint. This action was properly instituted within 90 days of the issuance of the Right-to-Sue letter.

13. With respect to the ERISA claims, on or about April 1, 2019, Defendant Sedgwick has formally acknowledged exhaustion of all administrative remedies and has confirmed its continued refusal to pay Plaintiff the short-term and long-term disability benefits to which he is entitled.

14. Plaintiff has commenced this lawsuit within the four-year statute of limitations applicable to a denial of benefits claim under ERISA.

## TRIAL BY JURY

15. Plaintiff respectfully requests a trial before a jury.

## PARTIES

16. Plaintiff, at all times relevant hereto, was and is a resident of Rockwall County in the State of Texas.

17. Upon information and belief, at all times relevant hereto, Defendant MCD was and is a limited partnership organized under the laws of the State of Texas with its principal place of business located at 7777 Forest Lane, Dallas, TX 75230. MCD is a hospital operated by HCA.

18. Upon information and belief, at all times relevant hereto, Defendant HCA was and is a corporation organized under the laws of the State of Delaware with headquarters located at 1 Park Plaza Nashville, TN 37203. HCA is a for-profit operator of health care facilities.

19. Upon information and belief, at all times relevant hereto, Defendant Sedgwick was and is a corporation organized under the laws of the State of Illinois with its principal place of

business located at 8125 Sedgwick Way Memphis, TN 38125. Sedgwick offers claims administration, managed care, program management, workers compensation, liability, and other related services for its clients, which includes MCD.

20. Upon information and belief, at all times relevant hereto, Defendant Prudential was and is a corporation organized under the laws of the State of New Jersey with its principal place of business located at Prudential Plaza 751 Broad Street, Newark, NJ 07102. Prudential is one of the largest insurance companies in the world and provides a variety of insurance products to its customers, which include MCD and/or HCA.

## STATEMENT OF FACTS

21. Corsaro was hired on October 9, 2017 by MCD and HCA as a Technical Analyst.

22. As a Technical Analyst, Corsaro implemented and supported facility and division desktop equipment and was a technical resource responding to end user desktop incidents and requests reported to the service desk. Corsaro adhered to and supported HCA IT policies and procedures and recommended process changes that improved the implementation, maintenance, and support of IT, desktop equipment, and software.

23. Prior to his employment with MCD and HCA, Corsaro had suffered from a brain tumor and had undergone brain surgery and brain radiation that resulted in underlying structural changes to his brain.

24. Corsaro also has epilepsy, which he treats with medication.

25. For approximately the first year of his employment, Corsaro performed the essential job duties of his position without any accommodation, and to the satisfaction of his employers.

26. In and around fall 2018, however, Corsaro began to develop short-term memory issues. Specifically, he was diagnosed with a progressive memory impairment.

27. On September 28, 2018, Defendants MCD and HCA wrote up Corsaro for "forgetting to complete tasks."

28. It was about this time that Corsaro mentioned to his boss, Alshawn Perry, that he suffered from a brain tumor, underwent brain surgery, and was diagnosed with epilepsy.

29. Corsaro also informed Perry that his medication for epilepsy causes memory loss, fatigue, and loss of focus at times.

30. In sum and substance, the response Perry gave was something along the lines of "Well, try to do better."

31. Perry did not instruct Corsaro to contact Human Resources.

32. The fact that Corsaro had no further communication about the issue shows a blatant, willful, and malicious disregard for his health and well-being and zero interest in engaging in the interactive process.

33. Corsaro then scheduled an appointment with his neurologist, Dr. Nicole Simpkins, M.D.

34. On October 12, 2018, Dr. Simpkins evaluated Corsaro and requested additional testing because of the complexity of Corsaro's condition. She immediately stated that it was essential he take FMLA leave for further testing.

35. Dr. Simpkins noticed that between Corsaro's brain surgery, brain radiation, lesions, epilepsy, and epilepsy medication, she faced a difficult challenge of determining precisely why Corsaro was suffering memory loss and impaired cognitive functions.

36. Dr. Simpkins had to determine whether the impaired cognitive function was due to the underlying tumor, lesions, epilepsy medication, medication dosage, radiation, multiple sclerosis, underlying seizures, or simply advancing age.

37. Dr. Simpkins had to be extremely careful with her tests and evaluations and, while she focused on Corsaro, it was absolutely essential that he refrained from working, so that he could focus all of his time on being observed for potential necessary changes in medication dosage, seizure activity, and Audio and Visual Electroencephalography (EEG) testing.

38. Corsaro went on FMLA leave starting October 15, 2018.

39. Corsaro received only six (6) weeks of short-term disability pay until November 26, 2018 through MCD's Short-Term Disability plan (the "STD Plan").

40. Sedgwick is MCD's claims administrator for the STD Plan and provides coverage as a claims manager on behalf of Prudential.

41. The STD Plan provides for up to twenty-one (21) weeks of coverage for each illness or event, including a seven (7) calendar-day (five business-day) elimination period.

42. The STD Plan runs concurrently with FMLA leave.

43. STD Plan is designed to replace a percentage of an employee's pay when they are away from work for more than seven (7) calendar days due to a personal injury or illness; under the STD Plan, Corsaro received 60 percent of his income.

44. Corsaro's illness or event lasted substantially longer than six (6) weeks, yet he only received benefits for that short time period.

45. On November 2, 2018, Dr. Gregg D'Angelo, Ph.D., performed a neuropsychological evaluation on Corsaro. The evaluation demonstrated continued relative weakness in immediate and delayed memory for both verbal and visual material.

46. On November 20, 2018, the neurologist communicated that Corsaro should undergo additional testing. Dr. Simpkins also believed more testing was necessary.

47. The STD Plan would have begun on or about October 15, 2018, when Corsaro took FMLA leave and was originally approved through November 27, 2018.

48. By the end of those six (6) weeks, however, it was clear that Corsaro still required extensive additional testing.

49. Therefore, on November 27, 2018, Corsaro applied for extended short-term disability benefits.

50. On December 19, 2018, Corsaro learned that his claim for extended short-term disability was denied.

51. Dr. Simpkin's assistant called Sedgwick several times to explain that Corsaro was still disabled.

52. Sedgwick rarely acknowledged these calls with any sincerity, and, instead, redirected the assistant to send faxes or other types of communication with a slow response time.

53. Dr. Simpkins later wrote a note, dated February 11, 2019, explicitly stating "Corsaro was not cleared to return to work from November 27, 2018 to January 9, 2019."

54. Corsaro was not cleared at this time because his seizures and epilepsy were being carefully examined as Dr. Simpkins evaluated his epilepsy medication dosage. Dr. Simpkins had to determine whether the risk of more serious seizures was worth the benefit of a lower dosage; she eventually determined that the risk was not worth the benefit.

55. Sedgwick communicated on December 19, 2018 that Corsaro had until June 22, 2019 to appeal this decision. Corsaro filed a timely appeal and appealed the decision through April 2019.

56. Corsaro was disabled in accordance with the text of the STD Plan, because he was under the regular care of Dr. Simpkins who found it necessary to further examine and treat Corsaro for a number of reasons before she could completely assess if and when Corsaro was capable of returning to work and under what conditions.

57. Dr. Simpkins faxed a message to Defendants MCD and HCA on February 11, 2019 and expressed that for all the same reasons as the first six (6) weeks, brain lesions, radiation, epilepsy, etc., Corsaro was in no way cleared to work through the end of his FMLA leave.

58. From November 27, 2018 through January 9, 2019, Corsaro remained on unpaid FMLA leave to continue examination and testing under the care of Dr. Simpkins.

59. From December 14, 2018 through December 17, 2018, Corsaro was subject to more testing, such as in home Audio and Video EEG.

60. During his FMLA leave, Corsaro underwent neuropsychological testing, close examination of multiple brain lobes, but the testing primarily focused on the left temporal lobe, which is directly associated with memory formation, and evaluations on how those tests and procedures impacted his cognitive function.

61. It was also crucial to examine how any changes to his medication would worsen underlying seizures.

62. Throughout this period, Dr. Simpkins continued to express concern with Corsaro's health and mental status.

63. By the end of his FMLA leave in January, however, Dr. Simpkins had begun to conclude that Corsaro's medication was necessary to prevent seizures but that its negative effects on memory retention compounded the underlying cognitive impairment from which he was already suffering.

64. Despite this assessment, however, Corsaro felt forced to return to work prematurely because of the denied benefits, lack of income, and mounting, extensive medical bills.

65. On January 3, 2019, Dr. Simpkins provided Defendants MCD and HCA with a note which stated that Corsaro "may return to work on January 9, 2019. He will need 15-minute breaks every 2 hours. He will be utilizing various notes and reminders for tasks."

66. Both Dr. Simpkins and Corsaro notified Defendants MCD and HCA and Human Resources on January 3, 2018 that Corsaro would be returning to work but needed the above-described accommodation to perform his essential job functions.

67. On January 9, 2019, Corsaro returned to work under the assumption that he would receive his reasonable accommodation.

68. Defendants never provided these accommodations.

69. The nature of Corsaro's disability demanded Defendants MCD and HCA engage in the interactive process, which they wholly failed to do.

70. At no time did MCD or HCA engage in the interactive process, but, rather, they claimed his requests for help were performance issues and used them as a basis for termination.

71. Corsaro returned to work much to the surprise of his boss, Perry, as Defendants MCD and HCA did not even notify him that Corsaro was returning to work.

72. Corsaro was instructed to meet with Human Resources that day and, in the meeting, he remembers that the people he met with assured him that they would let "whoever" know about his return to work.

73. Whether Human Resources actually told anyone about the reasonable accommodation is still unclear at this point, but Corsaro did notify Perry about the FMLA leave, the brain tumor, the medication and treatment, and that he required reasonable accommodation.

74. Defendants MCD and HCA set Corsaro up to fail by overwhelming him with tasks that could have been easily performed by others.

75. When Corsaro did ask for assistance and reminders about duties, Defendants used this plea for help as evidence in support of his termination.

76. Defendants MCD and HCA not only failed to engage the interactive process, but once Corsaro forced them to confront the reasonable accommodations associated with his disability, they fired him for it.

77. Small, mundane, or trivial tasks could have been assigned to other employees, so that Corsaro could have a short break to take notes or otherwise have a moment to refocus on his primary tasks at hand as per Dr. Simpkin's instructions.

78. It should be of little surprise that Corsaro's coworkers never accommodated his disability, as Defendants MCD and HCA failed to put them on notice, despite receiving notes from Dr. Simpkins and Corsaro.

79. Defendants MCD and HCA subsequently reprimanded Corsaro for failing to remember things, which would not have likely occurred had the reasonable accommodation recommended by Corsaro's doctors been provided.

80. MCD and HCA did not facilitate the use of Corsaro's reasonable accommodation, and effectively prevented him from being able to take advantage of the reasonable accommodations for breaks and use of notes.

81. Defendants MCD and HCA cited that the coaching they offered failed because of Corsaro's inability to grasp and retain the coaching.

82. Rather than fail to grasp and retain coaching, Corsaro was simply unable to use any reasonable accommodation because of MCD and HCA's failure to provide support for and to implement the accommodations.

83. On February 26, 2019, Defendants MCD and HCA terminated Corsaro.

84. Some purported reasons for his termination were Corsaro's purported inability to meet the minimum expectation of his manager and a failure to grasp critical understanding of tasks at hand; both of these criticisms were directly related to Corsaro's disability.

85. Another reason was because Corsaro asked a question during a team meeting; when confronted, Corsaro admitted that he did not know why he asked and that his mind was "foggy."

86. Defendants MCD and HCA also argue that Corsaro did not accurately report the times he came to work and when he left; this is completely inaccurate.

87. Corsaro's timeclock badge was created to work at Green Oaks and he did not receive a new one when he was transferred to MCD.

88. This caused Corsaro to be the only one whose times were inaccurately reflected.

89. Both Perry and Costilla, Corsaro's supervisors, were aware of this yet Corsaro's performance evaluation suggests that he should have filed a "Kronos edit request form."

90. The issue persisted for months, yet neither Perry nor Costilla ever undertook any steps to help Corsaro fix the situation, nor did they notify him that there was any issue.

91. Many of these criticisms and "performance" citations were the result of symptoms of Corsaro's disability.

92. Had Defendants MCD and HCA provided reasonable accommodations, Corsaro would have been able to perform the essential functions of his job and would not have been terminated.

93. During a team meeting after he returned from FMLA leave, Corsaro introduced himself to a Human Resources representative in front of everyone else, and the representative responded by saying "oh, I've heard a lot about you."

94. This public display was a willful and malicious attack on Corsaro's disability and FMLA leave.

95. Corsaro continued to be evaluated by Dr. Simpkins following his termination. On a note dated April 26, 2019, Dr. Simpkins wrote that Corsaro was under her care and she needed to evaluate his cognitive function for the rest of the year.

96. Corsaro clearly needed further testing and medical care after his employment and certainly after his FMLA leave.

97. The STD Plan should have run until March 11, 2019. At that point, Corsaro would have exercised the entirety of the STD Plan and would have been eligible for long-term disability.

98. Sedgwick and Prudential were aware that Plaintiff continued to be disabled through the entirety of his FMLA leave and after his termination.

99. Upon information and belief, Sedgwick has a history and practice of denying short-term disability benefits so as to preempt any possibility of long-term disability benefits.

100. Upon information and belief, Sedgwick's business model relies on compensation related to the limitation of disability benefits; stated differently, Sedgwick makes more money the earlier it denies a claimant's benefits.

101. Sedgwick owed a duty to Corsaro to manage his claim throughout the entirety of his disability but failed to do so.

102. This failure prevented Corsaro from being able to apply for long-term disability benefits which he would have otherwise been entitled to.

103. Sedgwick cannot cite Corsaro's return to work as a reason for denying his benefits under the STD Plan because he was disabled for twelve (12) weeks but was denied benefits only after six (6) weeks into the disability leave.

104. The benefits were denied well before Corsaro was even being considered fit for work.

105. Had Corsaro stayed on the STD Plan, he would have qualified for long-term disability.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
### **Retaliation under the FMLA Against Defendants MCD and HCA**

106. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

107. Under the FMLA, an employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period" "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. §§ 2612(a)(1), 2612(a)(1)(D).

108. Furthermore, "The FMLA prohibits interference with an employee's rights under the law" including right to be free of retaliation.  29 CFR § 825.220(a).

109. Plaintiff had a serious health condition.

110. Plaintiff requested leave by asking for time off to recuperate before returning to work.

111. Defendants MCD and HCA then terminated Plaintiff's employment.

112. Defendants MCD and HCA's decision to terminate Plaintiff was directly related to his need for FMLA leave. Had Plaintiff not asked for and needed leave, he would not have been terminated.

113. Defendants MCD and HCA willfully and intentionally violated the FMLA by terminating Plaintiff for requesting medical leave.

114. Defendants MCD and HCA did not have a good-faith belief for believing that its conduct did not violate the FMLA.

115. Plaintiff seeks from Defendants MCD and HCA equitable relief, economic damages, liquidated damages, interest, attorneys' fees, and costs, as well as any other remedies the Court deems proper.

## SECOND CAUSE OF ACTION
**Failures to Provide Reasonable Accommodations in Violation of the ADA Against Defendants MCD and HCA**

116. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

117. The ADA requires employers to provide a reasonable accommodation to qualified individuals with disabilities.

118. Plaintiff was qualified for his position under the ADA, as he had been satisfactorily performing his essential job duties one year.

119. Defendants MCD and HCA failed to provide an accommodation for Plaintiff's disabilities.

120. As a direct and proximate consequence of Defendants MCD and HCA's discrimination, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages,

including, but not limited to, emotional distress and suffering and economic loss, all in amounts to be determined at trial.

121. Defendants MCD and HCA's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff seeks an award of punitive damages against Defendants MCD and HCA.

### THIRD CAUSE OF ACTION
**Wrongful Termination Based on Disability in Violation of the ADA Against Defendants MCD and HCA**

122. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

123. The ADA prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of a perceived disability.

124. Defendants MCD and HCA discriminated against Plaintiff on the basis of his disability by terminating his employment because of his disability.

125. As such, Defendants MCD and HCA have violated the ADA.

126. As a direct and proximate consequence of Defendants MCD and HCA's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, economic loss and emotional distress and suffering, all in amounts to be determined at trial.

127. Defendants MCD and HCA's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff seeks an award of punitive damages against Defendants MCD and HCA.

### FOURTH CAUSE OF ACTION
**Wrongful Denial of Benefits in Violation of ERISA § 502(a)(3) Against Defendant Sedgwick and Prudential**

128. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

129. Plaintiff has been disabled since October 15, 2018.

130. Plaintiff was a beneficiary under Defendants Sedgwick and Prudential's disability plan when he became disabled.

131. Defendants Sedgwick and Prudential denied Plaintiff his STD Plan benefits while he was disabled.

132. Because Defendants Sedgwick and Prudential wrongfully denied these benefits, Plaintiff was unable to apply for long-term disability benefits despite meeting the necessary criteria.

133. Defendants Sedgwick and Prudential's denial of benefits was arbitrary and capricious and lacks any substantial evidence to validate the denial.

134. Defendants Sedgwick and Prudential wrongfully limited Plaintiff's STD Plan and, thus, wrongfully limited his right to long-term disability benefits which were contingent on his complete exercising of the twenty-one (21) weeks of the STD Plan.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty under ERISA § 502(a)(3) Against Defendant Sedgwick and Prudential**

135. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

136. At all relevant times, Plaintiff was a beneficiary under the STD Plan.

137. At all relevant times, Defendants Sedgwick and Prudential had an affirmative duty to act solely in the interest of the participants and beneficiaries of the STD Plan and to act for the exclusive purpose of providing benefits to participants and beneficiaries of the STD Plan pursuant to Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A).

138. At all relevant times, Defendants Sedgwick and Prudential had an affirmative duty to act solely in the interest of the participants and beneficiaries of the STD Plan with the care, skill, prudence and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of the like character and with like aims pursuant to Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).

139. Defendants Sedgwick and Prudential denied Plaintiff benefits with bad faith.

140. Plaintiff appealed when his STD Plan was denied and provided evidence that he was disabled within the confines of the Plan, but Defendants Sedgwick and Prudential never overturned the decision on appeal.

141. Plaintiff seeks restitution of his forfeited employee benefits, surcharge, and any other relief necessary to make him whole.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty under § 502(a)(1)(B) Against Defendant Sedgwick and Prudential

142. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

143. Defendants Sedgwick and Prudential denied Plaintiff benefits under the STD Plan due to him under the terms of the STD Plan.

144. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

145. At all times relevant to this claim, Plaintiff was entitled to short term disability benefits under the STD Plan given that Plaintiff met the definition of disability contained in the STD Plan.

17

146. Defendants Sedgwick and Prudential's denial of STD Plan benefits to Plaintiff constitutes a violation of the terms of the STD Plan and Plaintiff's rights under the same.

147. Plaintiff is entitled to have the Court conduct a *de novo* review of the issues stated herein.

148. In the alternative, Defendants Sedgwick and Prudential's decision to deny Plaintiff's benefits is arbitrary and capricious. Defendants Sedgwick and Prudential operate with a conflict of interest because they operate the STD Plan in their own interest and the STD Plan, in turn, relies on Defendants Sedgwick and Prudential's evaluation.

149. Plaintiff seeks to recover benefits denied under the STD Plan in addition to attorney's fees and costs, pre-judgment and post-judgment interest, and all such other relief to which he may be entitled.

## SEVENTH CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the TLC against Defendants MCD and HCA

150. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

151. The TLC states that an employer shall not "fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee."

152. At all relevant times, Plaintiff was qualified to perform his job responsibilities. He could perform the essential functions of his job with reasonable accommodations.

153. Defendants MCD and HCA refused to provide Plaintiff with a reasonable accommodation for his disability.

154. As a direct and proximate consequence of Defendants MCD and HCA's failure to provide a reasonable accommodation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

155. Defendants MCD and HCA's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants MCD and HCA.

## EIGHTH CAUSE OF ACTION
**Unlawful Termination in Violation of the TLC against Defendants MCD and HCA**

156. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

157. The TLC mandates that no employer discriminate against a qualified individual on the basis of disability in regard to the terms and conditions of his or her employment.

158. Defendants MCD and HCA unlawfully terminated Plaintiff because of his disability.

159. As a direct and proximate consequence of Defendants MCD and HCA's disability discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

160. Defendants MCD and HCA's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants MCD and HCA.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;

B. For the second cause of action, damages to be determined at trial;

C. For the third cause of action, damages to be determined at trial;

D. For the fourth cause of action, damages to be determined at trial;

E. For the fifth cause of action, damages to be determined at trial;

F. For the sixth cause of action, damages to be determined at trial;

G. For the seventh cause of action, damages to be determined at trial;

H. For the eighth cause of action, damages to be determined at trial and

I. For such other and further relief as the Court deems just and proper.

Dated: Dallas, Texas
       July 28, 2021

THE HARMAN FIRM, LLP

By: /s/ Walker G. Harman, Jr.

Walker G. Harman, Jr. [WH-8044]
*Attorney for Plaintiff*
244 Fifth Ave., Suite H211
New York, NY 10001
(646) 248-2288
wharman@theharmanfirm.com